## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

**JOHNNY LARRY CRENSHAW, individually and
GLENDA WEBB, individually,**

                      **Plaintiffs,**

**V.**

**CITY OF DETROIT, a Municipal Corporation,
DETROIT POLICE OFFICER JEROLD
BLANDING in his Individual Capacity,
DETROIT STEVEN TURNER, in his
individual capacity, DETROIT POLICE
OFFICER DAN BRYANT, in his individual
capacity,**

                      **Defendants,**

U.S.D.C. Case No. 99-71841

Hon. John Corbett O'Meara
Magistrate Steven Pepe

_____/

**DAVID A. ROBINSON P38754
DAVID A. ROBINSON and ASSOCIATES
ATTORNEY FOR PLAINTIFFS
29200 Southfield, Suite 207
Southfield, MI 48076
(248) 423-7234**

**JACOB SCHWARZBERG P37693
CITY OF DETROIT LAW DEPARTMENT
ATTORNEY FOR DEFENDANTS
1650 First National Building
Detroit, MI 48226
(313) 237-3036**

_____/

## PLAINTIFFS' RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1

40

## *INTRODUCTION*

In this case the plaintiff, Johnnie Larry Crenshaw, was wrongfully shot by an off-duty police officer. Plaintiff Glenda Webb, along with Johnnie Larry Crenshaw, was falsely arrested.

This case involves the use of deadly force by an off-duty officer. Along with the officer, the City of Detroit is being sued under 42 USC § 1983 for civil rights violations:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any State or
> Territory or the District of Columbia, subjects, or causes to be
> subjected, any citizen of the United States or other person
> within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and
> laws, shall be liable to the party injured in an action at law,
> suit in equity, or other proper proceeding for redress. For
> purposes of this Squad, any Act of Congress applicable
> exclusively to the District of Columbia shall be considered to
> be a statute of the District of Columbia.

42 USC §1983.

## *STATEMENT OF FACTS IN THE INSTANT CASE*

On October 5, 1998, at about 9:56 p.m., the Plaintiffs attempted to make a legal withdraw from an NBD[1] ATM machine located at Joy Rd. and Appoline in the City of Detroit.

Plaintiff Johnnie Crenshaw wanted to draw $20.00 off of his credit card. Ms. Webb, Mr. Crenshaw's friend, drove him to the ATM machine in her dark green 1994 Mercury Villager mini van. Ms. Webb drove into the parking lot and drove to the machine numbered 327, which is the machine farthest east of the bank.

---

[1] Now Bank One

Ms. Webb made several attempts to operate the machine for Mr. Crenshaw. She failed. As a result she and Johnnie left the machine, and called his sister for instructions. After returning from telephoning Johnnie's sister, Ms. Webb pulled her mini van up to the second ATM machine, number 328. Again, she attempted to withdraw twenty ($20.00) dollars. Again, she was unsuccessful. In the meantime, another car pulled up to machine number 327. Johnnie went over to a cream-colored Ford Contour and asked the female driver for assistance.[2] This woman, although reluctant at first, assisted Johnnie. As the driver of the Contour was assisting Johnnie, Ms. Webb noticed a car pulling up behind her in line at machine number 328. She decided to pull forward to allow that car to use the ATM machine.

As she circled around the block and was re-entering the bank lot, she saw Johnnie coming from the good samaritan's car, and approach the passenger side of the new car accessing machine 328. That car was a dark blue 1999 Suburban driven by Defendant Police Officer Blanding. Officer Blanding had his girlfriend with him in his van. As Ms. Webb, saw that Johnnie was going to the wrong car, she blew her horn and flashed her lights. Johnnie did not notice. He inadvertently opened the passenger door of the Suburban., At that second he realized his mistake, raised his hands, apologized and shut the door. This should have been the end of the story.

However, Defendant Officer Blanding shot through the rear passenger side window from his position in the driver's seat of the Suburban. Evidence suggests that Johnnie was shot in his left hand and left shoulder at this time. There is a factual question whether Johnnie realized that

---

[2] This person is Dnesi Laveran Bonner. She is the daughter of Shirley M. Thomas, the ATM card holder, and an eyewitness to the shooting. She was never contacted by any police investigator.

he was shot at the time.  Mr. Crenshaw continued to walk backwards, with his hands up and apologizing, towards Ms. Webb's mini van.  Ms. Webb saw the defendant Blanding get out from the Suburban and fire a barrage of bullets at the retreating Plaintiff  **[Exhibit 1]**.  When she realized the defendant was shooting at Johnnie, she backed her mini van up in a northerly direction.  She continued to look, at intervals, and saw Johnnie get hit again by the bullets as he stood next to her mini van.  Johnnie collapsed, and Ms. Webb got out of her mini van to help him.  At this time, she heard the defendant Blanding--for the first time--identify himself as a police officer.  He ordered her to get away from Johnnie.

Johnnie was shot when there was absolutely no threat of harm to Defendant Blanding  or any other person.  Johnnie was shot both near the Suburban and several yards from its rear.  When Johnnie left ATM machine number 327, he was carrying his wallet, his credit card and a $20.00 bill in his left hand.  He dropped these items as he was shot.

The physical evidence confirms Johnnie's account of the shooting.  Attached as **Exhibit 2** is the police scene sketch and the evidence technician's narrative report.  This sketch shows the items lying on the ground at the spot where Johnnie believes he was shot.  The fact that Johnnie was holding his credit card in his left hand is confirmed by the evidence technician's report which states blood was found on Johnnie's credit card.   This is consistent with the x-ray reports that indicate that metal fragments were found in Johnnie's left hand  **[Exhibit 3]**.

Another bullet entered Johnnie's left side when he bent down to pick up his wallet, after he had dropped it.  The final bullet entered Johnnie's body as he was trying to seek refuge by getting into the van.

4

As noted above, the police never attempted to speak with the good samaritan who witnessed the shooting, even though they had access to her identity through the bank **[Exhibit 4]**. Plaintiff obtained her statement and it is attached as **Exhibit 5**.   In this statement, she confirms that the wounds to Johnnie's left hand occurred while his hands were up in the air, as if surrendering.  She indicates his hands were up and he was apologizing when he was shot by Blanding.

**Exhibit 2** also depicts the blood trial which begins where Plaintiff's wallet fell to the ground.

From the scene, Johnnie was taken to the hospital as a police prisoner. Ms. Webb was also arrested and taken to police headquarters.

At police headquarters, Ms. Webb was handcuffed to a table.  Later she was placed in a small room.  She was interrogated and eventually released.

At the hospital, Johnnie was interrogated.  He remained in the hospital for another day, and his several gunshot wounds were treated. He was discharged with a bullet remaining in his shoulder.  The bullet was surgically removed several months later.

## ARGUMENT

Against the backdrop of the above fact statement, and for the reasons argued below, Plaintiffs argue that defendants are not entitled to dismissal of this case under Rule 56.

### Burden of Proof

Summary Judgment is granted only if there is no genuine issue as to a material fact and the moving party is entitled to judgment as a matter of law.  **Fed. R. Civ. P. 56(c)**.  Further, the

court views the allegations in the light most favorable to the nonmoving party. *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir. 1983).

There are two different burdens of proof at the summary judgment stage: One for elements of the plaintiffs' case in chief, and one for Defendants' affirmative defenses.

For elements of plaintiffs' case in chief (such as the policy or custom issue raised below), Plaintiffs must put forth specific facts that when taken in the light most favorable to the non-moving party, and coupled with any reasonable inferences, establish a genuine issue of material fact such that a reasonable jury could find for the Plaintiffs. *See, Matsushita Electric Industrial Co., Ltd. v. Azenith Radio Corp.*, 475 US 574, 587 (1986).

However, as to the issue of the individual defendants' affirmative defense of qualified immunity for their actions, Defendants bear the burden of proof at trial and at the summary judgment stage. *Ryan b. Burlington County, N.J.*, 860 F.2d 1199, 1204 n.9 (3rd Cir. 1988), *cert. denied*, 490 U.S. 1020 (1989).

> Summary judgment would not be appropriate if there is a factual dispute (i.e. genuine issue of material fact) involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights.

*Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988), *cert denied*, 488 U.S. 1007, 109 S. Ct. 788, 102 L.Ed.2d 780 (1989) (citations omitted).


## *LIABILITY*

**I.**  <u>**A Municipality is Liable When it's Policies, Practices, or Customs Result in a Constitutional Deprivation and injury**</u>

6

Plaintiffs' allegations in their Complaint, against the City of Detroit, include the

following Constitutionally violative policies and/or customs:

a.   [The City of Detroit Police Department's failure t]o adequately, properly, objectively and fairly investigate the use of deadly force by a member.

b.   . . . [F]ostering a policy, in an investigation of the use of deadly force where an officer shoots and injures, or shoots and kills a person, where objective facts--unfavorable to the offending police officer--are deliberately ignored . . . [and the City] conclude[s] that the officer's use of deadly force was justified when, in fact, the use of deadly force was not. That the investigation process, itself, is perfunctory, and geared toward exoneration of the offending officer. . . . [An examination of] prior use of deadly force investigations by the Detroit Police Department Homicide Section into shootings will reveal this pattern of deliberate ignorance [purposely carried out] to make an unjustified shooting into a justified shooting to save the offending officer from any censure. That plaintiff will point to [specific] cases as examples of this deliberate neglect, but not [limited to:]. . . Lamont Hemphill, deceased; Christopher Welch, permanently injured; Roy Hoskins, deceased; and Cora Bell Jones, deceased.

c.   . . .[Failure] to have a policy, practice and/or procedure, [or the failure to enforce an existing policy, which] . . . mandates officers . . . observing illegal conduct regardless if a fellow officer is involved, to protect the legal and Constitutional rights of the victims.

d.   . . . [F]ailure to adequately train Blanding and the other officers in the [proper degree]of force . . .to be used . . . [under] a given presentation of danger or set of circumstances.

e.   That upon the failure to investigate as alleged in (b) above, a practice of no discipline inures. Th[is] failure to discipline encourages the same unconstitutional use of force that gave rise to the [previous] plaintiffs' losses. . .Plaintiffs' Complaint pp _____.


Plaintiffs' burden of proof to establish municipality is stated in ***Monell v New York City Dep't***

***of Social Services***, 436 U.S. 658 (1978) as follows:

[L]iability may exist only where the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by the body's officers...The court also held that one may sue for a constitutional

7

deprivation under section 1983 pursuant to government custom even though such a custom has not received formal approval by the body's official decision making channels.

*Id* at 691.

The crux of a constitutional claim against a municipality is that the plaintiff must prove a causal nexus between a policy or practice that was either facially unconstitutional or unconstitutionally applied and plaintiff's damages. In the instant case plaintiffs argue the latter.

In *City of Canton v. Harris*, 489 U.S. 378 (1989), the Court held unanimously that a policy need not be unconstitutional on its face to serve as a basis for liability under § 1983. In *Canton*, in the context of a claim based on the municipality's failure to train its officers, the court held that a policy or custom which causes a constitutional violation is a sufficient basis for liability against the municipality, even if the policy standing alone would be constitutionally neutral.

Proper use of deadly force is judicially well defined. An officer is authorized to use deadly force in one circumstance: 1)self defense or defense of others. Even in apprehending a fleeing felon, independent justification must exist in that the fleeing felon must pose a significant threat of harm. In neither case is the law so liberal that an officer can shoot simply because he is scared, angry or has an <u>unreasonable</u> fear of harm. Police may never use deadly force unless "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 1697, 85 L.Ed.2d 1 (1985). Application of the Fourth Amendment to the examination of objective reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the

8

safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Sova v City of Mt. Pleasant*, 142 F.3d 898, 903 (1998).

Each separate offer of deadly force must be independently examined for reasonableness. In the instant case, Defendant Blanding fired four to five bullets at Johnnie Crenshaw. Officer Blanding attempts to justify his authority to shoot Johnnie by stating that he saw plaintiff open the passenger door and put his left hand on Blanding's girlfriend, off-duty Officer Tracie Ellege's arm[3]. Officer Ellege was the passenger in the Suburban at the time of the shooting. Further, he states he saw a black object in Plaintiff Crenshaw's right hand, which caused him to shoot at Crenshaw two to three times, while still inside the vehicle. A highly contested factual dispute exists between Defendant Blanding and Officer Ellege's versions of the shooting. This material issue goes to the heart of Blanding and Ellege's claim of perceived danger from plaintiff. Ellege, claims she, too, saw the black object and quickly shut her passenger door, after which Blanding shot at Johnnie. Contrast this to Blanding's version in which the door is open when he fires his initial shots **[See Exhibit 6 , the deposition testimony of Blanding and Elledge]**.  If the door was shut, as Ellege claims, there was no danger to either Blanding or Ellege when the first shot was fired. Defendant Blanding cannot articulate a  justification of deadly force with the door shut.

The next level of necessary analysis is the justification for the second round of shots, fired after Blanding got out of his vehicle in pursuit of Johnnie. Defendant Blanding claims he was justified because he was chasing a fleeing felon. However, under *Garner, supra* no

---

[3] **Plaintiff vehemently denies he did anything more than inadvertently open and then close the passenger door of the defendant's car.**

9

justification existed which would have justified Blanding's second offer of deadly force.  First, there was not probable cause to believe that Plaintiff had committed a felony (attempted robbery).  Second, no reasonable fear of harm to either the officer or his girlfriend existed as Johnnie backed away with his hands in the air, apologizing for his honest, understandable mistake.

Ms. Bonner confirms Johnnie was never threatening and was profusely apologetic.  By the time the last of the shots were fired, he was running for safety.  As stated above, even a fleeing felon must pose a significant threat of harm to the officer or others before the offer of deadly force can be made.  A fleeing felon cannot be gunned down while running for safety.

The only thing Johnnie was guilty of was accidentally opening the wrong car door.  In our civilized society, this is not punishable by execution.  Johnnie did not have a gun.  Johnnie was never charged with any crime.

Additionally, the off-duty officers are not entitled to the benefit of the doubt regarding the dark object.  While, Johnnie did have his wallet in his hand, neither officer's initial report alleges that the black object was perceived as a weapon [ **See Exhibit 7, the PCR's of Blanding and Elledge** ].  Thus, the dark object is a red herring designed to draw attention away from the defendant's shooting of an unarmed citizen.

Despite all the evidence contradicting Blanding's justification for his use of deadly force, the homicide investigators ruled the shooting justified.  Again, this follows the pattern above.  Inuring from this pattern is the common knowledge on the police force that an officer can literally get away with murder so long as he recites the magical incantation of "fearing for my life" or hides behind the magical talisman of the "dark, shiny object."

10

The lower federal courts are in agreement that the failure to discipline officers for police misconduct is a sufficient basis for a municipal liability claim. Proving such a claim can be done by demonstrating a series of prior violations by officers and then prove that no discipline was imposed on the officers. Further, it is not required that there be a specific showing that the present defendants knew of the particular failure to discipline.  In *Gentile v City of Suffolk*, 926 F 2d 142 (2d Cir. 1991), the court considered this very issue. "Defendants further claim that plaintiffs did not establish sufficient evidence of a causal connection between the County's negligent disciplinary policies in handling cases of police and prosecutorial misconduct and the conduct of individual defendants in this case and thereby failed to fulfill the Monell standard for a finding of municipal liability. They argue that under Monell there must be affirmative evidence of a causal connection between the alleged municipal policy and the conduct of the individual policemen and that the record at trial is devoid of such evidence." The court held:

> These arguments are without merit. Plaintiffs were not obliged to produce particular evidence that defendants had specific knowledge of a declared policy of the County and acted on this knowledge in promoting the malicious prosecution of plaintiffs. This is only one method -- and not the exclusive one -- of establishing the necessary link between municipal practice and individual behavior. The critical question here is whether there is sufficient evidence in the record of municipal policy, custom or practice, so that a jury could reasonably infer that the individual conduct in this case was causally connected to the policy.*fn5 See Batista v. Rodriguez, 702 F.2d 393, 398 (2d Cir. 1983), which states that "a causal connection between the City's policy of inaction and the arrests and assault might permissibly be implied" from "conduct" "such as inadequate training and supervision or prior instances of unusual brutality indicating deliberate indifference or gross negligence on the part of the municipal officials in charge." Cf.

The appropriate inquiry in this Monell-type claim focuses on the actual or constructive knowledge of the municipality as well as upon the implied knowledge and reliance of municipal employees on that practice. Not only does the SIC report tend to establish the existence of a municipal policy or practice, but it also supports plaintiffs' allegation that the police and the District Attorney's Office were likely . . . to consistently ignore evidence of misconduct on the part of the defendant officers and to sanction and cover up any wrongdoing connected with the Gentile and Rydstrom investigation. We reject defendants' claim that there was insufficient evidence to sustain a Monell claim against the County. Id.

In the instant case it is therefore not required that the instant defendants have known of the policy of the Detroit Police to fail to discipline its members who have wrongfully used deadly force.. *See also Batista v Rodriguez,* 702 F 2d 393 (1983), the failure on the part of the defendant city to take any disciplinary action whatever in any of the cases in which police officers of said city have been found responsible for violations of civil rights.

## THE CRIMINAL INVESTIGATION OF BLANDING

A complete failure to initiate, and conduct, a meaningful investigation of police misconduct on the part of the chief law enforcement officer may be found to constitute official toleration of police misconduct.  Such toleration, if proved, is unconstitutional. See *Dorsey v Detroit,* 858 F.2d 338, 345 (6th Cir.1988).

In the case at bar, the woeful excuse for an investigation performed by defendants gives rise to liability.  The instant investigation was not meaningful as required by the Constitution, as interpreted by the Sixth Circuit in *Dorsey, supra.*  The police department's failure to perform a fair, objective examination of the evidence and available eyewitness testimony regarding the

12

shooting of Johnnie Crenshaw, resulted in the department's conclusion that the shooting was, as it could only have been, as history foretold, "justified."

Both the process and the quality of the investigation were fatally flawed. The investigator deliberately closed his eyes at the proverbial wheel and ignored the physical evidence and key eyewitness testimony.

The process was faulty as the investigator took less than the bare-minimum steps, which would have discerned how and why plaintiff was shot. For instance, after taking an initial statement from Johnnie Crenshaw and Glenda Webb, the investigator never contacted either of them for any follow-up interview. Second, the investigator never made the telephone call necessary to determine the identity of Ms. Bonner (or any other ATM user who might have witnessed the shooting). In deposition, Sergeant Reginald Harvel, the investigator, demonstrates the City's deliberate indifference to whether the shooting of the Plaintiff was justified or not. He tends to minimize the significance of the department's failure to contact Ms. Bonner and the impact of what Ms. Bonner might offer as an eyewitness **[See Exhibit 8 ]**. Finally, the investigator asked Blanding the following leading question during the interview: "The black object you saw in the [complainant's] hand did you think it was a gun?"**[Exhibit 9]**. This question was suggestive and designed to spoon feed Defendant Blanding the justification for shooting plaintiff. At no prior point did Blanding refer to the black object as a weapon. Blanding, of course, readily agreed and after this question the infamous black object became a "weapon."

The quality of the investigation was also flawed in that the investigator did not interview Defendant Blanding until after Blanding conferred with his union lawyer, who helped him

13

prepare his police report.[4] Second, the investigator never questioned Blanding's improbable claim that he shot two tor three times before exiting his car. Even though only one shell casing was found in his vehicle.

Federal law, through 42 USC § 1983, also allows a civil rights action when the defendants fail to investigate misconduct or fail to discipline for misconduct. The courts have recognized that an absence of a strictly enforced disciplinary system leads officers to believe they are above the law and will not be sanctioned for their misconduct. See *Bordanaro v McLeod,* 871 F.2d 1151, 1162 (1st Cir.1989).

A refusal to seriously investigate an incident, or a refusal to discipline the involved officers may constitute a pattern of conduct. Ratifying bad conduct by recklessly ignoring evidence that government employees have violated a plaintiff's Constitutional rights is actionable. *See, Gentile v Suffolk County,* 926 F.2d 142, 146 (2d Cir.1991).

In April of 1985, William L. Hart, former City of Detroit Chief of Police, created a special unit working under the Internal Controls Bureau called the "Special Investigative Unit." The responsibilities of this unit were to examine all discharges of weapons by officers and to determine whether each discharge was a violation of criminal law and/or department rules and regulations. **[Exhibit 10]**.

In January of 1994, the Special Investigation Unit was disbanded by the then new/now former Police Chief Isaiah McKinnon. The responsibility for investigating shootings by officers was supposed to be turned over to the Homicide Special Assignment Squad.

---

[4] In fact, the union attorney typed Blanding's police report for him.

14

However, the Homicide Special Assignment Squad was not ordered to investigate and make recommendations as to whether an officer involved in a shooting violated department policy until October 1999. This fact was discovered in the deposition of Reginald Harvel. The Officer in Charge of the instant investigation. **[Exhibit 11]**.

Between January of 1994 and October of 1999, there was no unit assigned to investigate whether an officer using deadly force had violated department rules or regulations.[5] Thus, there was no administrative censure by the department for any improper offer of deadly force for over five years. This demonstrates the defendant's wilful and deliberate indifference. For over half a decade officers knew, for certain, that no matter how egregious their conduct was, they would not be disciplined administratively. At trial, plaintiffs will prove that this knowledge was a proximate cause of Plaintiff Crenshaw's injury and Constitutional breach.

At the time of this incident, no one from the City examined Blandings or Ellege's conduct for a violation of departmental rules. (Nor as it turns out, was any strict scrutiny given as to the question of criminal culpability). As this Court wells knows, the prosecutor only examines the presented facts for a violation of law which can be established beyond a reasonable doubt. As a result, if the evidence (as presented by the investigators) does not merit the issuance of a criminal warrant, the officers are free from administrative scrutiny. Further, the prosecutor will not involve it's office in controlling or determining the manner of the police investigation. Should

---

[5] Examples of departmental violations would include, but not be limited to, conduct unbecoming an officer; mistreatment of a person or prisoner; wilful disobedience of rules or orders; neglect of duty; neglecting to report any member of the department known to be guilty of violation of any rule, regulation or order issued for the guidance of the department; and unjustified or careless use of firearms. Detroit Police Department General Order 72-17.

the prosecutor do so, it's office might subject itself to lose it's absolute immunity. See *Prince v. Hicks, et al*, 1999 WL 1081637 (6th Cir.(Tenn.)

Officers know that the incantations and talismans of "I saw a shiny object" or "The perp put his hand in his jacket, as if reaching for a weapon" will get them past prosecution. They know they will not be questioned further. This knowledge creates a pattern of conduct where an officer readily states: "I saw a black object," "Fearing for my safety, and the safety of my partner and others, I fired." No objectively reasonable grounds for this fear are necessary.

As referenced in Plaintiffs' Complaint, this is not an isolated incident. It is surprisingly commonplace for Detroit Police Officers to injure, maim, and kill citizens through their unlawful use of deadly force. For example, on April 7, 1994, Christopher Welch was shot in the jaw by Officer Mark Burke.

On August 24, 1994, Lamont Hemphill was shot in the back by Officer Steven Howell.

On May 4, 1997, Roy Hoskins, a fourteen-year-old boy, was shot in the back by Officer James Wood.

On November 18, 1997, Hong Junior Leong was killed by Officers James Pratt and John Borgers.

On October 23, 1998, Liquory Hines, a sixteen-year-old boy, was shot in the neck by Officers Anthony Jackson and Jeffrey Manson.

These five unjustified police shootings, including the present matter, are not alone. In discovery Plaintiffs' have obtained other files, but use these five to illustrate the present issue. There are many other similar incidents. In all cases, despite glaring evidence to the contrary, the investigative Squad declared the officers' actions: "justified." **[See Exhibit 12].**

This policy, pattern and practice of exonerating police officers who shoot citizens through an investigative process which ignores the truth and seeks only to justify officers actions, has inured to individual officers, including the named defendants in this matter, becoming deliberately indifferent to the Constitutional right of Plaintiffs, and others, to be free from unreasonable seizure. Safe in the knowledge, that no discipline will follow an unconstitutional offer of deadly force, Defendants develop a callous disregard for Plaintiffs' Constitutional rights.

The cases discussed above demonstrate the problem and establish proximate causation in the instant civil rights claim. In the following section, Plaintiffs demonstrate that Defendant Blanding's action is consistent with, the product of, and/or amounted to, a municipal policy, custom or practice. See *Beck v City of Pittsburgh*, 89 F.3d 966 (3rd Cir.1996).

In *Beck* the lower court, applying traditional tort principals, ruled that where a plaintiff can demonstrate that a municipal policy or custom was the proximate cause of a Constitutional violation, she is entitled to a judgment against the municipality. *Id.*

## II. The Individual Defendants Have Failed to Establish That Their Actions Are Protected by Qualified Immunity

As outlined above, in order to be entitled to qualified immunity, the Defendants must show that the Plaintiff's right was either 1)Not clearly established at the time of the violation; or that 2)The individual Defendants did not, and should not have, known that their actions violated Plaintiff's Constitutional rights. In the present matter, their argument fails on both prongs of the test.

### A. *Plaintiffs'Right to be free from unlawful seizure under the 4th Amendment Was Clearly Established*

17

The right to be free from unlawful seizure is well established. *See, DeShaney v. Winnebago County Dept of Social Services*, 489 US 189, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989).

Defendants, in their brief, fail to argue why the court should dismiss on the basis of qualified immunity....Defendants' Brief pps 9 and 10, neither does Defendants' motion....p5.

Further the right to be free from the unjustified or careless use of a firearm was recognized by Defendants in the City's own General Orders, which state, in part: "mistreatment of a person or prisoner, neglect of duty, neglecting to report any member of the department known to be guilty of violating any rule, regulation or order issued for the guidance of the department and unjustified or careless use of firearms are considered major department violations.

At the scene of the shooting there was no evidence that required the arrest and handcuffing of Glenda Webb. Certainly, there was no reason to handcuff her to a desk once at the homicide headquarters or to place her in a small confining room by herself. Neither, was there any evidence to reasonably believe that the crime of attempted robbery had in fact occurred. The Plaintiff's wallet and his credit card identified him at the scene. Ms. Webb was clearly identified at the scene. Simply because the defendant shot a someone does not in itself mean someone must be arrested. Both the plaintiffs were arrested, not detained for questioning.

In light of the fact that defendants fail to articulate an argument in support of their defense of qualified, plaintiffs would reserve in this response further argument until the hearing.

18

*Conclusion*

In light of the applicable standard of law as it relates to the instant facts, including the

multitude of factual questions which exist, summary judgment is precluded.  Thus, this court

should deny the Defendants' motion in its entirety.

Respectfully Submitted,

David A. Robinson    P38754
Attorney for Plaintiff(s)
29200 Southfield Road
Suite 207
Southfield, Michigan 48076
(248) 423-7234

Dated: December 30, 1999

19

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN

JOHNNY LARRY CRENSHAW, individually and
GLENDA WEBB, individually,

                       Plaintiffs,

V.

CITY OF DETROIT, a Municipal Corporation,
DETROIT POLICE OFFICER JEROLD
BLANDING in his Individual Capacity,
DETROIT STEVEN TURNER, in his
individual capacity, DETROIT POLICE
OFFICER DAN BRYANT, in his individual
capacity,

                       Defendants,

U.S.D.C. Case No. 99-71841

Hon. John Corbett O'Meara
Magistrate Steven Pepe

---

**DAVID A. ROBINSON P38754**
*DAVID A. ROBINSON and ASSOCIATES*
ATTORNEY FOR PLAINTIFFS
29200 Southfield, Suite 207
Southfield, MI 48076
(248) 423-7234

**JACOB SCHWARZBERG P37693**
*CITY OF DETROIT LAW DEPT.*
Attorney for Defendants
1650 First National Building
Detroit, MI 48226
(313) 237-3036

---

### PROOF OF SERVICE

The undersigned certifies that a copy of *Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment  along with this Proof of Service* was served upon:  Jacob Schwarzberg, Esquire, 1650 First National Building, Detroit, MI 48226, on the 30th day of December, 1999 via first class mail, postage fully prepaid thereon.

Yolonda Dye

h:\robinson\wpfiles\civil\crenshaw\crenshaw.p9s

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

# SEE CASE FILE FOR ADDITIONAL DOCUMENTS OR PAGES THAT WERE NOT SCANNED

☐ EXHIBITS _____

☐ TRANSCRIPTS _____

☐ ELECTRONIC MEDIA _____

☒ OTHER _Attachments_ _____